IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CITY OF PORTLAND, OREGON, an
Oregon municipal corporation,

        Plaintiff,

       v.                                    Civil No. 03-538-AS

ELECTRIC LIGHTWAVE, INC., a                OPINION AND ORDER
Delaware corporation,

        Defendant.
_____

Terrence Thatcher
Benjamin Walters
Tracy Pool Reeve
Deputy City Attorneys
Office of City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
     Attorneys for City of Portland

Timothy R. Volpert
Davis Wright Termaine LLP
1300 SW Fifth Avenue, Suite 2300
Portland, OR 97201

Charles L. Best
Electric Lightwave, Inc.
4400 NE 77th Avenue
P.O. Box 8905
Vancouver, WA 98668
        Attorneys for Electric Lightwave, Inc.

ASHMANSKAS, Magistrate Judge:

## OVERVIEW OF COMPLAINT

The City of Portland (City) filed a complaint against
Electric LightWave, Inc. (ELI), for breach of contract for
failing to pay franchise fees due and owing under a municipal
franchise (Franchise Agreement) the City and ELI entered into
eight years ago.  Under the Franchise Agreement, the City granted
ELI the right to construct and operate a telecommunications
system, "in, under, and over the surface of the City's streets."
In return, among other things, ELI agreed to pay the City
compensation of 5% of its "gross revenues" earned from
telecommunications services in the City.  ELI responded to the
complaint that it is no longer required to comply with the terms
of the contract under the Federal Telecommunications Act of 1996,
47 U.S.C. § 253 (FTA or Act).

The parties filed cross-motions for summary judgment.  The
City seeks judgment on its breach of contract claim and asks the
court to strike or dismiss all eight of ELI's affirmative
defenses and all five of ELI's counterclaims.  The City also
seeks summary judgment on certain contract interpretation

issues.[1]  Conversely, ELI seeks summary judgment against the
City's breach of contract claim and in favor of its first, fourth
and fifth counterclaims, all based on its theory that the
Franchise Agreement is preempted by the Act.  The parties also
filed motions to strike portions of the other's summary judgment
submissions.

## BACKGROUND

In 1990, the City and ELI entered into the Franchise
Agreement that allowed ELI to use city streets for the purpose of
providing telecommunications services to ELI's customers in
exchange for ELI's payment of a franchise fee to the City.  The
1990 Franchise Agreement was amended and updated during the
spring of 1996.  On June 19, 1996, the City passed Ordinance
170283, granting ELI a telecommunications franchise for 10 years.
The Franchise Agreement was approved by the City Council in July
1996, and reaffirmed and validated by the City Council in January
1999.  Specifically, on January 6, 1999, the City enacted
Ordinance 172996 (Ratifying Ordinance), which ratified the City's
June 19, 1996 grant of a franchise to ELI.

Section 21 of the Ratifying Ordinance required ELI to file a
written acceptance of the Ordinance within 30 days and provided:
"Such acceptance shall be unqualified and shall be construed to

---

[1]     In an earlier ruling, the court granted, in part, and
denied, in part, the City's Motion for Judgment on the Pleadings
to Dismiss Defendant's Second, Third, and Fourth Counterclaims.

be an acceptance of all the terms, conditions and restrictions contained in this ordinance and Ordinance No. 170283." Section 21 of Ordinance No. 170283 is virtually the same. ELI sent the City an "Acceptance of Franchise Ordinance 172996" on January 7, 1999. The Ordinance required ELI to return an acceptance of the Franchise Agreement to the City within 30 days after the date of the Ordinance or it would be null and void. The City neglected to send out the acceptance and, as a result, the acceptance was never returned. To remedy this error, the City ratified the Franchise Agreement on January 6, 1999, with the Franchise Agreement to be effective as of September 19, 1996. ELI signed a document accepting the terms and provisions of the Franchise Agreement on January 7, 1999, as required by the Ordinance and the Portland City Code.

After <u>City of Auburn v. Qwest Corp.</u>, 247 F.3d 966, <u>amended and superceded by</u>, 260 F.3d 1160 (9th Cir. 2001), was decided in 2001, ELI notified the City, by letter dated July 25, 2001, that numerous sections of the Franchise Agreement, including most of those sections at issue here, appeared to have been impacted by the decision in <u>City of Auburn</u>, and asked the City to meet to discuss that impact and to renegotiate the Franchise Agreement pursuant to Section 17, which sets forth terms for renegotiation of the Franchise Agreement. By way of a letter dated August 1, 2001, the City refused to renegotiate the Franchise Agreement.

On August 15, 2001, ELI advised the City that it believed
several aspects of the Franchise Agreement violated the FTA.  ELI
stopped paying Franchise fees as required under the Franchise
Agreement and, instead, made payments pursuant to a formula that
it felt was appropriate under the terms of the Act.  The amounts
otherwise due were deposited in an escrow account[2] which, at the
time this action was filed held approximately 2.2 million
dollars.  The City then filed this action for breach of contract
based, in part, on ELI's failure to pay the Franchise fee
pursuant to the terms of the Franchise Agreement.[3]

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The materiality of a fact is determined by the
substantive law on the issue.  T.W. Electrical Serv., Inc. v.

---

[2]     The City contends that the payments to the escrow
account were not timely made pursuant to the terms of the
Franchise Agreement.

[3]     The City also alleges breach of contract based on ELI's
failure to:  1)deposit the funds in escrow in a timely manner; 2)
provide detailed maps and drawings of its telecommunications
system; 3) provide a route map on an annual basis and; 4) allow
the City access to its books and records regarding gross
revenues.

<u>Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).  The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  <u>Id</u>. at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  <u>T.W. Electrical</u>, 809 F.2d at 630.

## DISCUSSION

By way of historical information, the court notes that the City is a municipal corporation in existence since its first legislative charter became effective in 1851.  To date, the City had granted 26 telecommunications franchises.[4]  The City

---

[4]     At oral argument, the City explained that there are two different kinds of telecommunications franchises; one is for a right to use the rights of way ubiquitously allowing the

represented at oral argument that it has never rejected a telecommunications franchise. Indeed, in his sworn affidavit, David Olson, the Director of the City's Office of Cable Communications and Franchise Management (Franchise Office), testified that "[i]n the years that I have served as the Director of the Franchise Office [since 1983], the City has (a) never denied a telecommunications franchise to any applicant; (b) never refused to renew or extend the term of a telecommunications franchise when requested by the franchisee; and (c) never declined to approve a change in ownership or control of a telecommunications franchise." Id. In addition, the City has franchise agreements with various energy utilities and other companies with extensive facilities in the City streets. Declaration of David C. Olson.

ELI operates in the State of Oregon as a "competitive telecommunications provider" under a Public Utility Commission grant of authority. See Or. Rev. State. § 759.005(2). Declaration of Mary Beth Henry. As mentioned above, the City

---

franchisee to go anywhere in the City streets (at issue here). In each such instance, the franchisee agrees to pay the City 5% of its gross revenues earned within the City, plus provide the City with duct or other telecommunications facilities for the City's use. The second type is referred to as a "point-to-point" long distance franchise. In those cases, the company is allowed to use only a limited and specified area of the City, typically along one linear route. In return, the franchisee pays a per foot franchise fee to the City. See also Declaration of Mary Beth Olson.

granted its first franchise to ELI in 1990. That Franchise Agreement provided that ELI would pay the City a Franchise fee of 5% of its gross revenues, as defined in the Franchise Agreement. ELI has operated under the current Franchise Agreement since 1996. ELI provides 21 different kinds of telecommunications services to customers in Portland, and by its own admission, there are no telecommunications services which ELI offers elsewhere in the United States but not in Portland as a result of the 1996 Franchise Agreement. ELI's Response to City's Interrogatory No. 3, Exhibit 1 to Thatcher Deposition. ELI provides no residential telecommunications services in the City.

ELI's 1990 Franchise Agreement was the first such franchise granted by the City to a competitive telecommunications carrier. Id. Subsequent to ELI's first Franchise Agreement, many other competitive telecommunications carriers have sought and obtained franchises or other authority to occupy City streets. Id. In fact, the City has issued 13 franchises similar to that granted to ELI to other competitive telecommunications providers. Declaration of Mary Beth Henry.

Qwest Corporation (Qwest) is the successor to the former Bell system telecommunications monopoly provider, Pacific Northwest Bell, later U.S. West. Qwest operates as a telecommunications utility as defined under Or. Rev. Stat. § 759.005(1), providing, among other things, local telephone

service.  Qwest provides telecommunications service in Portland and occupies City rights of way under the terms of a revocable permit granted by the City.  Qwest provides the bulk of residential telecommunications services in Portland.  Qwest permit fees for use of City rights of way are set at 7% of revenues earned by Qwest in the City from the sale of exchange access service.  This is identical to the privilege tax the City is authorized to levy on Qwest under Or. Rev. Stat. § 221.515. The terms of Qwest's permit and ELI's Franchise Agreement have several similarities.

In its filings with the City, Qwest recently declared annual exchange access revenues earned within Portland city limits of approximately $80 million.  Qwest provides the vast bulk of residential telephone service in Portland.  In fact, it is estimated that Qwest competitors have only about six percent of the residential market in the Portland metropolitan region.  Id. (citing findings by the Oregon Public Utilities Commission).

I.   **Cross-Motions for Summary Judgment**

The City seeks partial summary judgment in its favor on questions of liability raised in this case.  Specifically, the City requests an order:  (1) declaring that ELI has breached its contractual obligations under the Franchise Agreement and the City is due damages to be determined at a later stage; (2) declaring that ELI's affirmative defenses are insufficient to

excuse ELI's failure to comply with the terms of the Franchise Agreement; (3) dismissing ELI's counterclaims against the City; and (4) declaring that revenues earned by ELI from collocation services, finance charges, and Carrier Access Billing System (CABS) and Local Access Billing System (LABS) billings are gross revenues under the terms of the ELI Franchise Agreement.

Conversely, ELI seeks summary judgment on the City's claim for breach of contract, on ELI's first counterclaim for violation of sections 253(a) and (c) of the Act, on ELI's fourth counterclaim for breach of contract and on ELI's fifth counterclaim for declaratory judgment. The essence of ELI's motion is that the Franchise Agreement imposes numerous burdensome requirements and revenue-based fees that are invalid under the FTA and the Ninth Circuit's decision in <u>City of Auburn</u>. ELI maintains that the City's Franchise Agreement is similar in scope and substance to those preempted in <u>City of Auburn</u>, because it prohibits or may prohibit ELI from providing telecommunications services.

### A.    Preemption by the Telecommunications Act of 1996

Congress passed the FTA, in order "promote competition among and reduce regulation of telecommunications providers." <u>City of Auburn</u>, 260 F.3d at 1170. In furtherance of this goal, Congress implemented restrictions on the authority of local governments to limit the ability of telecommunications companies to do business

in local markets.  See AT & T Corp. v. Iowa Utilities Bd., 525
U.S. 366, 371 (1999).  Section 253 of the FTA "embodies the
balance between Congress' new free market vision and its
recognition of the continuing need for state and local
governments to regulate telecommunications providers on grounds
such as consumer protection and public safety."  TCG New York,
Inc. v. City of White Plains, 125 F.Supp.2d 81, 87 (S.D.N.Y.
2000), aff'd in part, rev'd in part on other grounds, 305 F.3d 67
(2d Cir. 2002)(quotation and citations omitted).

     The plain terms of section 253 preempt many local laws;
however, notwithstanding this general prohibition, local
governments retain some regulatory authority.  Under section 253,
all state and local regulations that prohibit or have the effect
of prohibiting any company's ability to provide
telecommunications services are preempted unless such regulations
fall within either of the statute's two "safe harbor" provisions,
sections 253(b) and (c).  See City of Auburn, 260 F.3d at 1175.
The parties agree that only section 253(c), pertaining to local
regulation of rights of way, is applicable to the case at hand.
See id. at 1176.

     Thus, to resolve the present claims, the court must first
determine whether the City's regulations fall within the
proscription of section 253(a) and, if they do, the court must
then determine whether certain provisions are nevertheless

permissible under section 253(c).  See, e.g., City of Auburn, 260
F.3d at 1175-1180; City of White Plains, 305 F.3d at 77.

> **1.  Section 253(a) – Does the City's Franchise
> Agreement Prohibit or Have the Effect of
> Prohibiting Telecommunications Services?**

As mentioned above, section 253(a) places limits on the
City's authority to regulate telecommunications services.
Specifically, section 253(a) provides that no "local statute or
regulation . . . may prohibit or have the effect of prohibiting
the ability of any entity to provide . . . telecommunications
service."  47 U.S.C. § 253(a).  In Qwest v. City of Portland,
Magistrate Judge Jelderks considered the plain wording of the
statute to determine the scope of the prohibition on local
regulation of telecommunications.  200 F.Supp.2d 1250, 1255-1256
(D.Or. 2002), aff'd, in part, rev'd, in part, 385 F.3d 1236 (9th
Cir. 2004), cert. filed, 73 USLW 3570 (March 16, 2005).  Judge
Jelderks determined, and this court agrees, that the statute
provides only that "no local requirements may:  (1) prohibit the
ability to provide service, or (2) have the effect of prohibiting
the ability to provide service."  Id. at 1255.  Judge Jelderks
rejected Qwest's argument that the prohibition in section 253(a)
included regulations that actually prohibit the entity's ability
to provide telecommunications services and those that may have
the effect of prohibiting the provision of such services.  Id.
(emphasis added).  Judge Jelderks reasoned that Congress used the

word "may" simply as a synonym for "is permitted to" and ruled that if the challenged requirements do not prohibit or have the effect of prohibiting the provision of telecommunications services, the FTA does not preempt the requirements. <u>Id</u>. at 1255-1256.

The Ninth Circuit reversed this decision by our court and stated without explanation that "'[s]ection 253(a) preempts regulations that not only prohibit outright the ability of any entity to provide telecommunications services, but also those that <u>may</u> have the effect of prohibiting the provision of such services.'" <u>City of Portland</u>, 385 F.3d at 1240-1241 (emphasis added)(quoting <u>City of Auburn</u>, 260 F.3d at 1175 (citation, alteration, and internal quotation marks omitted)); <u>see also</u> <u>Qwest Corp. v. City of Santa Fe</u>, 380 F.3d 1258, 1270 n.9 (10th Cir. 2004)("Section 253(a) bars any legal requirement which may have the effect of prohibiting the ability of an entity to provide telecommunications service."). Moreover, the Ninth Circuit emphasized that a provider is not required to make an actual showing of "a single telecommunications service that it . . . is effectively prohibited from providing." <u>City of Portland</u>, 385 F.3d at 1241. Rather, under Ninth Circuit law, regulations that may have the effect of prohibiting the provision of telecommunications services are preempted. <u>Id</u>. In addition, the district court must consider the cumulative effect of a

regulatory scheme.  See City of Auburn, 260 F.3d at 1176 ("The ordinances at issue in the present case include several features that, in combination, have the effect of prohibiting the provision of telecommunications service.")

The Ninth Circuit's interpretation of the scope of section 253(a) appears to depart from the plain meaning of the statute and extend the barrier for local regulation of telecommunications services beyond what Congress intended.  Regardless, the Ninth Circuit has instructed the district courts to analyze franchise provisions both individually and cumulatively to determine whether they prohibit or "may" prohibit the provision of telecommunications services.  As instructed, the court will consider each provision of the Franchise Agreement between the City and ELI to determine whether it violates section 253(a).  If a provision or combination of provisions are found to violate section 253(a), the court will then consider whether the offending requirement is protected by the safe harbor provision of section 253(c).  Finally, if the requirement(s) violates section 253(a) and is not saved by section 253(c), the court will consider whether it is feasible to sever the offending provision(s) and keep the remainder of the Franchise Agreement in effect.

Section 1 of the Franchise Agreement is titled "NATURE AND TERM OF GRANT" and it grants the Franchise to ELI and allows it

to provide services.  By this provision, the City granted ELI its special occupancy rights for ten years.  ELI appears to contend that the very fact that the City requires a Franchise Agreement in order to provide telecommunications services violates the FTA as that statute was construed by the Ninth Circuit in <u>City of Auburn</u>.  For example, during oral argument, ELI stated "[T]he very fact that they require a franchise or that they require anything under <u>Auburn</u> is preemptive . . . ."  Transcript of Proceedings at p.17.  However, the Ninth Circuit has expressly acknowledged that a franchise requirement per se is not preempted by the FTA.  <u>See</u> <u>City of Auburn</u>, 260 F.3d at 1176 & n.11 ("[O]ur conclusion is based on the variety of methods and bases on which a city may deny a franchise, not the mere franchise requirement, or the possibility of denial alone.").

Subsection 1.5 of the Franchise Agreement is titled "Charter and General Ordinances to Apply" and it subjects the Franchise Agreement to the City's Charter and general ordinance provisions affecting matters of general City concern and not merely existing contractual rights of the grantee.  In other words, both the City and ELI must abide not only by the terms of the Franchise Agreement, but by all the ordinances and codes of the City.  The Franchise Agreement incorporates all requirements of Chapter 10 of the City's Charter, which are applicable to all public

utilities.[5]  The Charter grants the City "general supervision and
power of regulation of all public utilities within the City of
Portland."  City Charter § 10-105.

ELI contends that subsection 1.5, subjecting it to all
requirements of Chapter 10 of the City Charter, must be
preempted.  According to ELI "such broad sweeping powers to
regulate and restrict telecommunications 'interfere with, or a
contrary to' the fundamental legislative purpose of the Act."
City of Auburn, 260 F.3d at 1175 (citation omitted).

In City of Portland, the Ninth Circuit considered this
precise issue; namely, a challenge to the City's "general
franchise requirements that apply to all public utilities" and
determined that:

> Portland's franchising process is not the result of a
> single, uniform ordinance regulating telecommunications
> providers. Rather, the city's franchising process includes a
> number of provisions adopted over the course of many years
> and are applicable to utilities generally. . . . We doubt
> whether City of Auburn can be read so broadly as to apply to
> ordinances that are not specific to the telecommunications
> permitting process.  Base on the record before us, there is
> no indication, that Portland . . . . [has] passed ordinances
> that are specific to the telecommunications process and
> apply to all telecommunications providers attempting to
> enter the market.[]  Therefore, to the extent that Qwest

---

[5]     Subsection 1.5 of the Franchise Agreement incorporates
sections 10-201 thru 10-218 of the Charter governing public
utilities franchises.  Section 201 of the Charter, in turn,
incorporates the remaining provisions, sections 10-101 thru 10-
108.

challenges these ordinance provisions, it is questionable whether § 253 even applies.[6]

385 F.3d at 1242. Thus, the Ninth Circuit has informed this court that City Charter provisions are not "telecommunications-specific" and it is "questionable" whether section 253 even applies. See id. at 1241-1242; compare City of Auburn, 260 F.3d at 1170 (Each of the challenged ordinances specifically addressed the provision of telecommunications services and was adopted after the enactment of the FTA in 1996.). Under the circumstances, this court is bound by precedent and therefore must find that the provisions of the City Charter, incorporated into Ordinance No. 170283, are not preempted by section 253(a) of the FTA.

Finally, regarding subsection 1.5 of the Franchise Agreement, the court notes that the City has contracted to "fetter" its discretion when applying its general Charter provisions; the Charter provisions apply only to the extent authorized by law. The City acknowledges its authority under the Franchise Agreement is limited by both state and federal law. The court concludes that section 1 of the Franchise Agreement does not violate section 253(a).

---

[6] Qwest challenged Portland's business license requirements (City Code Chapters 7.12 and 7.14), general franchise requirements that apply to all public utilities (City Charter sections 10-107 and 10-210(d)), and the City's temporary revocable permit with Qwest (Ordinance No. 175757).

Section 2 of the Franchise Agreement is titled "DEFINITIONS" and it defines the terms used in the Franchise Agreement. There is no contention by ELI that this provision should be preempted. The court finds that section 2 of the Franchise Agreement does not violate section 253(a).

Section 3 of the Franchise Agreement is titled "COMPENSATION AND AUDITING" and it sets forth, among other things, the basic monetary compensation ELI pays in return for its grant of authority to occupy the City's property. Specifically, ELI challenges the following requirements of section 3 as preempted by the FTA; the requirement: (1) to pay a Franchise fee of 5% of gross revenues (subsection 3.1); (2) to provide the City ELI's most-favored rate by prohibiting ELI from charging the City more than ELI charges other entities for similar telephone services (the City refers to this provision as a non-discrimination clause)(subsection 3.2); and (3) to provide written reports as to gross revenues in a form satisfactory to the City as well as ELI's books, maps, records, and its calculation of Franchise fee payments for the City's inspection upon no less than 48 hours notice (subsection 3.8). The court will consider each of these requirements in turn to determine if they are preempted.

Subsection 3.1 is titled "Amount of Compensation" and sets forth the 5% revenue-based fee. ELI challenges this provision in two ways; first, ELI argues that this provision is a barrier to

entry and it is prohibited by section 253(a).  The revenue-based
fee is part of a larger regulatory scheme by the City to prohibit
telecommunications providers from using city streets to provide
service unless they unconditionally accept the terms of the
Franchise Agreement.  In essence, ELI's position is that when
Congress enacted this legislation it intended that local
governments would step away from any regulation of
telecommunications providers except to recover costs for the use
of the local rights of way.

Secondly, ELI asserts that section 253 prohibits the City
from basing rights of way fees on ELI's gross revenues.  ELI
submits that the Franchise fee is not fair or reasonable, as
required by section 253(c), because it is based on ELI's gross
revenues, which is unrelated to the City's cost of managing its
rights of way.  The court will consider ELI's second argument
below only after it determines whether this provision violates
section 253(a).

In challenging revenue-based fees under section 253(a), ELI
relies on a statement from the Ninth Circuit in City of Auburn:
"Some non-tax fees charged under the franchise agreements are not
based on the costs of maintaining the right of way, as required
under the Telecom Act."  260 F.3d at 1176.  ELI does not argue
that the 5% fee imposes an economic hardship, i.e., the fee will
render them unprofitable or unable to participate in the market

place.  Indeed, ELI maintains that its competitive position in the market place is irrelevant.  Rather, ELI argues that the fact alone that the City has the power to prohibit ELI from using City streets to provide service unless it unconditionally accepts the terms of the Franchise Agreement, including the revenue-based fee, requires preemption as a matter of law.

ELI bears the burden of showing that the City's compensation violates section 253(a).  See Pacific Bell Telephone Co. v. Calif. Dept. of Trans., 2005 WL 937739 (N.D.Cal. 2005).  Indeed, like the requirement that a telecommunications provider obtain a franchise, there is no basis to suggest that a compensation requirement by the municipality based on a percentage of gross revenue is per se preempted by the FTA.  While ELI is not required to make an actual showing that it is effectively prohibited from providing telecommunications services, it must at least demonstrate that the requirement is or may be a "barrier to entry" into the City's telecommunications market.  City of Portland, 385 F.3d at 1241.

While the Ninth Circuit has not yet ruled on whether fees imposed on telecommunications providers must be cost-based, this court previously determined that when the Ninth Circuit referred to "non-cost-based fees," in City of Auburn, it specified application fees, not rights of way fees.  City of Portland, 200 F.Supp.2d at 1257 (citing City of Auburn, 260 F.3d at 1179

n.19.). Judge Jelderks explained that in the <u>City of Auburn</u>
litigation, the Ninth Circuit had no reason to address whether
section 253 preempted the municipalities' six percent
revenue-based "gross receipts tax." Qwest had expressly conceded
the tax's validity. 260 F.3d at 1176 n.10 ("The parties agree
that Washington law allows for a six percent gross receipts
tax."). A fair reading is that the issue of revenue-based fees
for the use of rights of way was not directly before the court in
<u>City of Auburn</u>.

Thus, this court cannot agree with ELI's contention that the
revenue-based fee is, on its face, prohibited by section 253(a)
of the FTA. <u>See</u> <u>AT & T Communications of the Pacific Northwest,</u>
<u>Inc. v. City of Eugene</u>, 177 Or.App. 379, 410, 35 P.3d 1029
(2001)(It is error to presume that the only legitimate exercise
of local regulatory authority under section 253(a) is to recover
the costs of the use of local rights-of-way.). Section 253(a)
does not address revenue-based fees, much less categorically
forbid them. <u>City of Portland</u>, 200 F.Supp.2d at 1256 (citing <u>TCG</u>
<u>Detroit v. City of Dearborn</u>, 206 F.3d 618, 624-25 (6th Cir.
2000)(Section 253 does not preempt a franchise fee equal to four
percent of gross revenues.)).

Further, there is no evidence in the record that the 5%
Franchise fee charged by the City, standing alone, is a barrier

to ELI providing services.[7]  Indeed, at the present time at least

13 other telecommunications companies are paying an identical 5%

fee.  Based on the record before it, the court finds that ELI has

not produced sufficient evidence to demonstrate that the City's

revenue-based fee is a prohibition within the meaning of section

253(a).

The court finds that subsection 3.1 of the Franchise

Agreement does not violate section 253(a).  Moreover, even if it

could be said that this fee "may prohibit" an entity from the

provision of telecommunications services, either standing alone

or in combination with other Franchise Agreement provisions, the

fee would be saved from preemption by section 253(c) since the

fee is compensation for use of the rights of way (see discussion

at A.2. below).

Subsection 3.2 of the Franchise Agreement is titled "City

Use of Telecommunications Services and/or Telecommunications

Systems" and requires ELI to offer services to the City at the

"most favorable rate offered at the time of the City's request

charged to a similar user within Oregon. . . ."  ELI again relies

---

[7]     ELI argues that the question of barrier to entry is not
specific to them.  Rather, the court must consider whether any
company may be prohibited from providing telecommunications
services under the circumstances.  The court is unable, on this
record, to find that the uniform 5% fee charged by the City must
be preempted because it theoretically may prohibit some
unidentified company from entering the telecommunications market
in Portland.  This is simply not what the FTA requires.

on the decision in <u>City of Auburn</u> to argue that this provision is preempted under section 253(a). <u>See</u> <u>City of Auburn</u>, 260 F.3d at 1179 (Court analyzes a "most-favored-community" provision under section 253(c) and determines that is unrelated to rights of way management.).

The City responds that this is simply a non-discrimination provision to protect the City. Moreover, the City does not purchase telecommunications services from ELI. Finally, the City contends that subsection 3.2 does not give it "unfettered discretion" to constrain ELI's general operations and, in fact, there is no showing by ELI of any economic impact whatsoever by this provision.

The court finds that subsection 3.2 of the Franchise Agreement is preempted by section 253(a). While the City does not currently purchase services from ELI, nothing in the terms of the Franchise Agreement prevent it from doing so over the ten year term of the Franchise Agreement. Also, there are no restrictions on the extent or amount of services that may be required by the City. Rather, pursuant to subsection 3.2, it appears that ELI must be prepared at all times to provide the City with whatever services they request, at a most-favored rate. This regulation "may prohibit or have the effect of prohibiting" the provision of services. The court finds that subsection 3.2 of the Franchise Agreement violates section 253(a).

Subsection 3.8 of the Franchise Agreement is untitled but it requires ELI to provide "books, maps, and records directly concerning its Gross Revenues under this Franchise and its calculation of Franchise fee payments to the City . . . upon no less than 48 hours prior written notice. . . to determine the amount of compensation due the City under this Franchise . . . ." ELI relies on the decision in City of Santa Fe to argue that this provision is preempted under section 253(a). See City of Santa Fe, 260 F.3d at 1269-1270 (Court analyzes the informational requirements of the registration process and lease application and determines that they are preempted by section 253(a).).

The court disagrees. Above, the court determined that the City was permitted under the FTA to seek reasonable compensation based on gross revenues for use of its rights of ways. The requirements of subsection 3.8 simply require ELI to keep accurate records of fees owed and allow the City to audit those records and confirm payment. It would be incongruent for the court to find that the fees were permissible under the FTA, but prohibit the City from any accounting for the payment of those fees.

The court finds that subsection 3.8 of the Franchise Agreement does not violate section 253(a). Moreover, even if it could be said that the requirements of this subsection "may prohibit" an entity from the provision of telecommunications

services, either standing alone or in combination with other provisions, subsection 3.8 would be saved from preemption by section 253(c) since it is in furtherance of permissible compensation for use of the rights of way (see discussion at A.2. below).

Section 4 of the Franchise Agreement is titled "GENERAL FINANCIAL AND INSURANCE PROVISIONS" and it requires ELI to carry insurance and post bonds. There is no contention by ELI that this provision should be preempted. The court finds that section 4 of the Franchise Agreement does not violate section 253(a).

Section 5 of the Franchise Agreement is titled "COVENANT TO INDEMNIFY AND HOLD THE CITY HARMLESS" and it requires ELI to indemnify the City if its use of the streets causes harm to others. There is no contention by ELI that this provision should be preempted. The court finds that section 5 of the Franchise Agreement does not violate section 253(a).

Section 6 of the Franchise Agreement is titled "CONSTRUCTION AND RELOCATION" and it sets out the basic rules for ELI's construction activities and relocation obligations. There is no contention by ELI that this provision should be preempted. The court finds that section 6 of the Franchise Agreement does not violate section 253(a). See also City of Auburn, 260 F.3d at 1166-1170 ("long-established and unbroken rule . . . that the utility company must pay relocation costs").

Section 7 of the Franchise Agreement is titled "RESTORATION OF STREETS" and it requires ELI to restore City streets that its operations damage. There is no contention by ELI that this provision should be preempted. The court finds that section 7 of the Franchise Agreement does not violate section 253(a).

Section 8 of the Franchise Agreement is titled "RESERVATION OF CITY STREET RIGHTS" and it reserves the public's rights to continue to use the streets occupied by ELI. There is no contention by ELI that this provision should be preempted. The court finds that section 8 of the Franchise Agreement does not violate section 253(a).

Section 9 of the Franchise Agreement is titled "CITY FIBER OPTIC PAIRS AND USE OF DUCTS BY CITY" and it provides additional "in-kind" compensation to the City by requiring that ELI provide telecommunications duct and cable for the City's use. The City explains that this is part of its compensation package and it is directly related to management of the rights of way.

In support of its claim that they are permitted "in-kind" compensation, the City cites the Second Circuit's decision in City of White Plains, as follows:

> [Municipalities] also retain the flexibility to adopt
> mutually beneficial agreements for in-kind compensation.
> Neutrally applied most-favored-vendee provisions that
> require services providers to offer their best rates to the
> city or requirements that service providers allow the city

free use of conduit space or similar treatment are at least
potentially permissible.

305 F.3d at 80.

At oral argument, the City represented that is has never
used any of the fiber, and it uses only a couple of blocks of
duct to run traffic signals, which is directly related to rights
of way management. Moreover, the City has submitted the
declarations of Matthew Lampe and Mary Beth Henry in support of
its assertion that the City has exercised its rights under the
Franchise Agreement's duct provision in only one instance, in
order to run traffic signal cable for a few blocks in the Lloyd
business district. The Declaration of Matthew Lampe provides:

> Under its telecommunications franchise granted by the City,
> ELI was directed to provide the City both fiber and conduit.
> No ELI fiber has been used by the City, including by IRNE.
> The City does use one segment of conduit provided by ELI,
> from NE 6th and Everett to NE 7th and Pacific, for traffic
> management purposes. No IRNE traffic traverses this
> conduit.

The Declaration of Mary Beth Henry provides: "The City does use
a run of conduit provided by ELI near the Lloyd District to carry
City communications related to traffic signals. Other than that,
the City uses no ELI facilities for its own communications
purposes."

Relying on the appellate courts' decisions in <u>City of Auburn</u>
and <u>City of Santa Fe</u>, ELI insists that section 9, requiring that
ELI install extra optical fibers for the City's use; to build and
install fiber optic connections to the City at cost plus 10%; to

provide the City with free use of surplus ducts and conduits;
and, to affix and maintain the City's wires and equipment at cost
plus 10%, violate the FTA.  See City of Auburn, 260 F.3d at 1179
(Under section 253(c) the court determined that "ordinance
requirements that companies provide free or excess capacity . . .
for the use of the cities or other users goes beyond management
of the rights-of-way."); City of Santa Fe, 380 F.3d at 1271, 1273
("[T]he excess conduit installation requirements are not
competitively neutral because they place risk on the party who
fist installs any conduit.")

     In City of Santa Fe, the district court was able to
determine that the conduit provision in the excess conduit
requirements could increase the provider's (Qwest) installation
costs by 30 to 59%.[8]  Contrast here where ELI again asserts that
evidence of economic viability is irrelevant to the analysis.  To
wit, ELI states:  "Under Auburn, ELI is not required to prove
that, as a matter of fact, the City's regulations prevent ELI
from providing any particular telecommunications service."

-------------------

     [8]     In order to obtain a lease, the provider was required,
among other things, to install excess capacity equal to 100% of
what the installer planned to use.  In addition, any conduit must
be dedicated in fee simple to the city.  City of Santa Fe, 380
F.3d at 1262.  The evidence before the district court was that
for projects that involve installation of new conduit, Qwest
estimated a 59% increase in cost in order to meet the requirement
of 100% excess-capacity conduit (Decl. of Daniel T. Sanchez)
while the City estimated a cost increase of between 30% and 50%
for such work (Aff. of Leroy N. Pacheco).  See Qwest v. City of
Sant Fe, 224 F.Supp.2d 1305, 1310 (D.N.M. 2002), aff'd., in part,
remanded, in part, 380 F.3d 1258.

Memorandum in Support of Motion for Summary Judgment at 7. ELI insists that the court is required to analyze the legality of the regulatory framework, not the provider's factual competitive position. ELI frames the issue as "whether the City's franchise requirements 'prohibit or have the effect of prohibiting' ELI's ability to provide services." Memorandum in Support of Motion for Summary Judgment at 8.

The court is not persuaded that it is required to analyze these provisions in a vacuum with no regard to economic impact on the provider. Indeed, what other benchmark would be used to determine whether a particular provision may have the effect of prohibiting a telecommunications provider from entering the market? Regardless, the court agrees that under existing law, section 9 of the Franchise Agreement violates section 253(a).

Section 10 of the Franchise Agreement is titled "STREET VACATION" and it mandates that if City vacates one of its streets, ELI must vacate that street as well. The City agrees, however, to assist ELI in locating a new place for its lines. There is no contention by ELI that this provision should be preempted. The court finds that section 10 of the Franchise Agreement does not violate section 253(a).

Section 11 of the Franchise Agreement is titled "MAINTENANCE OF FACILITIES" and it requires ELI to properly maintain its facilities that occupy City streets so that they do not become a nuisance. There is no contention by ELI that this provision

29 - OPINION AND ORDER

should be preempted. The court finds that section 11 of the Franchise Agreement does not violate section 253(a).

Section 12 of the Franchise Agreement is titled "COMMON USERS" and it sets up a system whereby ELI and other public utilities must share conduits and ducts if there is insufficient room for all utilities to have separate facilities. In those instances, ELI is required to allow other providers to use their surplus duct for a fee. In the event the duct is no longer surplus to ELI, they may reclaim it. There is no contention by ELI that this provision should be preempted. The court finds that section 12 of the Franchise Agreement does not violate section 253(a).

Section 13 of the Franchise Agreement is titled "DISCONTINUED USE OF FACILITIES" and it establishes rights and responsibilities in case ELI discontinues the use of facilities in the streets. There is no contention by ELI that this provision should be preempted. The court finds that section 13 of the Franchise Agreement does not violate section 253(a).

Section 14 of the Franchise Agreement is titled "HAZARDOUS SUBSTANCES" and it requires ELI to protect the City rights of way from hazardous substances. There is no contention by ELI that this provision should be preempted. The court finds that section 14 of the Franchise Agreement does not violate section 253(a).

Section 15 of the Franchise Agreement is titled "CITY'S WRITTEN CONSENT REQUIRED FOR ASSIGNMENT, TRANSFER, MERGER, LEASE

OR MORTGAGE" and it grants the City authority to review and consent to ELI's transfer of the Franchise or its facilities to another entity. ELI challenges subsection 15.4[9] of this Franchise Agreement provision under section 253(a) on the ground that the City retains unfettered discretion to deny transfers for any reason. See, e.g., Auburn, 260 F.3d at 1176, 1178 (Court preempted ordinance that regulated, among other things, the transferability of ownership.); City of White Plains, 305 F.3d at 82 ("[A] provision of sweeping breadth whose main purpose is to force each new telecommunications provider to receive [the city's] blessing before offering services . . . is invalid.").

The City insists that subsection 15.4 can be distinguished from the transfer provisions that were preempted in Auburn and City of White Plains on two grounds. First, under Oregon law, the Franchise Agreement is a mutually binding contract, subject to state law governing contracts, including the duty to operate in good faith. Under Oregon law, absent a contrary intent, a contract term requiring a party's consent prior to assignment is construed to included the requirement that consent shall not be

_____

[9]    Subsection 15.4 states:

> For the purpose of determining whether the City will consent to any assignment, transfer, merger, lease or mortgage, the City may inquire into the qualifications of the prospective party. The Grantee shall assist the City in any such inquiry. The City may condition any sale, assignment, transfer, merger, lease or mortgage upon such conditions as it deems appropriate.

31 – OPINION AND ORDER

unreasonably withheld.  See, e.g., Pacific First Bank v. New
Morgan Park Corp., 319 Or. 342, 353, 876 P.2d 761 (1994)("[T]here
is engrafted on this language by implication the phrase which
consent shall not be unreasonably withheld." (Quotations and
citation omitted)).  In addition, the duty of good faith requires
that "[w]hen one party to a contract is given discretion in the
performance of some aspect of the contract, the parties
ordinarily contemplate that discretion will be exercised for
particular purposes.  If the discretion is exercised for purposes
not contemplated by the parties, the party exercising discretion
has performed in bad faith."  Best v. U.S. Nat. Bank of Oregon,
303 Or. 557, 563, 739 P.2d 554 (1987).

Secondly, the Franchise Agreement itself bars the City from
implementing it in a way that would violate either state or
federal law.  Subsection 20.1(A) states that:  "Both Grantee and
the City shall comply with all applicable federal and state
laws."  Thus, the City must comply with the FTA when determining
whether to grant a transfer of ownership and is barred, by both
federal and state law, from denying such transfer for "any"
reason at all.

The court agrees with the City's characterization of the
extent of its discretion, under the Franchise Agreement, to
restrict transferability of ownership.  The expectation of the
parties is that the City will comply with all state and federal
laws in exercising its discretion to grant or deny a transfer.
32 - OPINION AND ORDER

Thus, the City is barred from turning away "any" provider without restriction as was the case in <u>City of White Plains</u>. 305 F.3d at 82; <u>see also</u> <u>TC Systems, Inc. v. Town of Colonie, New York</u>, 263 F.Supp.2d 471, 486 (N.D.N.Y. 2003). Indeed, the court in <u>City of White Plains</u> expressly noted that:

> A more limited franchise transfer provision could be reasonably related to regulating the use of the rights-of-way. For example, a transfer limitation, if applied neutrally to all franchisees, might permit rejection of a transferee on the basis of insufficient assurance of ability to pay reasonably imposed fees for use of rights-of-way.

305 F.3d at 82.

In the present case, subsection 15.4 permits the City to inquire into the qualifications of the prospective party and requires ELI to assist in that inquiry. Further, while that provision does allow the City to condition a transfer "upon such conditions as it deems appropriate," the City may not unreasonably withhold consent in accordance with Oregon law. These factors restrict the "breadth" of the provision and limit the City's discretion. Furthermore, ELI has a contract remedy in the event the City unreasonably withholds its consent. Thus, subsection 15.4 is distinguishable from the provisions that were preempted in <u>City of Auburn</u> and <u>City of White Plains</u>. The court finds that section 15 of the Franchise Agreement does not violate section 253(a).

Section 16 of the Franchise Agreement is titled "FORFEITURE AND REMEDIES" and it establishes contractual remedies in case of

33 - OPINION AND ORDER

a breach, including notification and opportunity to cure.  ELI
challenges the penalty of forfeiture for failure to submit timely
reports to the City regarding the calculation of its revenue-
based Franchise fee set forth in subsection 16.1(B)(2).  In
addition, ELI disputes the remedies of financial payment of up to
$1,000 per violation, or suspension of ELI's Franchise Agreement
rights set forth in subsection 16.2.  ELI maintains that both of
these provisions must be preempted because they may prohibit the
provision of telecommunications services.  See, e.g., Auburn, 260
F.3d at 1176; City of Santa Fe, 380 F.3d at 1269-1270.

     Relying on the Sixth Circuit's decision in City of Dearborn,
the City responds that since Congress did not take away the power
of localities to require franchises, it could not have intended
to preempt stipulated damages or penalties for franchise
violations.   See 206 F.3d at 624.  The City defends the
provisions as necessary to enforcing the contract -- accurate
reporting of compensation owed under the terms of the contract.

     As discussed above, the fact of a franchise requirement does
not violate section 253(a).  See City of Auburn, 260 F.3d at 1176
& n.11 ("[O]ur conclusion is based on the variety of methods and
bases on which a city may deny a franchise, not the mere
franchise requirement, or the possibility of denial alone.).
Neither the Act itself, nor subsequent case law, supports such a
conclusion.  Moreover, the court determined above that the
requirement that ELI keep accurate records of fees owed and allow
34 - OPINION AND ORDER

the City to audit those records and confirm payment set forth in subsection 3.8 was a permissible method of auditing the moneys owed under the Franchise Agreement.  Like subsection 3.8., subsection 16.1 is in furtherance of permissible compensation for use of the rights of way.  It is simply a remedy available to the City in the event ELI elects not to comply with the terms of the Franchise Agreement -- accurate reporting of moneys owed under the contract.  The court finds that section 16 of the Franchise Agreement does not violate section 253(a).

Section 17 of the Franchise Agreement is titled "RENEGOTIATION" and it sets forth procedures for renegotiation of contractual provisions that are declared invalid.  There is no contention by ELI that this provision should be preempted.  The court finds that section 17 of the Franchise Agreement does not violate section 253(a).

Section 18 of the Franchise Agreement is titled "EXPIRATION" and it establishes procedures at the expiration of the ten year franchise grant.  Essentially, ELI must reapply for the Franchise and it will be granted.  There is no contention by ELI that this provision should be preempted.  The court finds that section 18 of the Franchise Agreement does not violate section 253(a).

Section 19 of the Franchise Agreement is titled "PUBLIC RECORDS" and it identifies the City's obligations under Oregon public record laws, but specifies that ELI may identify information submitted to the City is confidential and not subject

to disclosure.  There is no contention by ELI that this provision should be preempted.  The court finds that section 19 of the Franchise Agreement does not violate section 253(a).

Section 20 of the Franchise Agreement is titled "MISCELLANEOUS PROVISIONS" and it contains a series of miscellaneous provisions related to severability, force majeure, notice and litigation.  There is no contention by ELI that this provision should be preempted.  The court finds that section 20 of the Franchise Agreement does not violate section 253(a).

Section 21 of the Franchise Agreement is titled "WRITTEN ACCEPTANCE" and it requires that ELI accept the Ordinance in writing for its grant to become effective.  There is no contention by ELI that this provision should be preempted.  The court finds that section 21 of the Franchise Agreement does not violate section 253(a).

In sum, the court has determined that the following provisions of the Franchise Agreement either individually or in combination may have the effect of prohibiting ELI and other companies from providing telecommunications services: subsection 3.2 titled "City Use of Telecommunications Services and/or Telecommunications Systems;" and section 9 titled "City Fiber Optic Pairs and Use of Ducts by City."  Moreover, in an abundance of caution, the court will assume that the following provisions are preempted by 253(a) and consider below whether they nevertheless are saved by the safe harbor of 253(c): subsection

3.1 titled "Amount of Compensation"; and untitled subsection 3.8 (documents required to calculate the Franchise fee). Finally, the court finds that all other provisions of the Franchise Agreement do not violate section 253(a) and remain in effect.

### 2. Section 253(c) - Are the City's Regulations Nevertheless Permissible?

Once the court finds that some of the City's regulations are preempted by section 253(a), it must consider whether the preempted Franchise Agreement provisions fall within the savings clause of section 253(c). City of Auburn, 260 F.3d at 1177. Subsection (c) of section 253 creates a "safe harbor" for certain types of state and local requirements. Thus, even if a provision would "prohibit or have the effect of prohibiting" under subsection (a), it will not be preempted by section 253 if it falls within the scope of (c).

Section 253(c) expressly authorizes local communities to manage their rights of way and receive "fair and reasonable" compensation "on a competitively neutral and nondiscriminatory basis" for their property. Local regulations that seek to regulate a city's rights of way are permissible, while local regulations that seek to regulate the provision of telecommunications services or the telecommunications providers themselves, are impermissible.

Section 253(c) provides:

STATE AND LOCAL GOVERNMENT AUTHORITY - Nothing in this

37 - OPINION AND ORDER

> section affects the authority of a State or local government
> to manage the public rights-of-way or to require fair and
> reasonable compensation from telecommunications providers,
> on a competitively neutral and nondiscriminatory basis, for
> use of public rights-of-way on a nondiscriminatory basis, if
> the compensation required is publicly disclosed by such
> government.

47 U.S.C. § 253(c).

The court will turn now to consider whether the provisions
at issue in this case can be saved by section 253(c). Regarding
subsection 3.2, titled "City Use of Telecommunications Services
and/or Telecommunications Systems," the court is convinced that
this is an impermissible regulation of the telecommunications
provider. There is no argument by the City that this provision
is related to management of its rights of way. Rather, the City
responds that it does not purchase telecommunications services
from ELI and, in any event, the provision is permitted by section
253(c) as part of "fair and reasonable compensation". Similarly,
section 9 titled "City Fiber Optic Pairs and Use of Ducts by
City" cannot stand. Again, the City does not argue that these
in-kind contributions manage the rights of way; rather, they are
fair and reasonable compensation for use of the rights of way.

The court finds that under existing Ninth Circuit law, these
provisions cannot be saved by section 253(c). The Ninth Circuit
stated that "[t]hese ordinances bear no relation to management of
the rights-of-way, but focus solely on rates, terms and

conditions of services."[10] <u>Id</u>. (Court invalidated requirements
that the franchisee offer the best available rates and terms and
provide free or excess capacity.); <u>see also</u> <u>City of White Plains</u>,
305 F.3d at 81 (Court affirms the district court's invalidation
of the most-favored-vendee clause.); <u>Santa Fe</u>, 380 F.3d at 1273
(Court was convinced that "excess conduit installation
requirements [were] not competitively neutral."). These
provisions, subsection 3.2 and section 9, have the effect of
regulating a company's rates, terms and conditions of services,
are unrelated to rights of way management, and the City has not
shown them to be permissible compensation. Accordingly, these
provisions are invalid and must be stricken from the Franchise
Agreement. The court will consider below whether these invalid
provisions may be severed from the Franchise Agreement or whether
the Franchise Agreement must be declared invalid because the
preempted provisions are an integral part of the agreement
between the parties (see discussion at A.3. below).

Regarding subsection 3.1, titled "Amount of Compensation,"
the court must determine whether revenue-based rights of way fees

---

[10]     The City insists that the in-kind and most favored
rates provisions are simply part of a negotiated compensation
package and, therefore, permissible under section 253(c). The
court agrees that in some instances such a compensation
requirement may withstand preemption. <u>See</u>, <u>e.g.</u>, <u>City of White
Plains</u>, 305 F.3d at 80. In this instance, however, the City is
seeking both the prevailing market rate, a 5% Franchise fee, and
the in-kind and most favored rates compensation.

are permitted under section 253(c).  ELI's position is straight
forward -- it interprets the term "fair and reasonable
compensation" set forth in 253(c) to mean cost.[11]  Moreover, to
be fair and reasonable the fee must be based on the actual cost
of maintaining the rights of way.  ELI maintains that the City
has no idea what it costs to maintain the rights of way and,
therefore, the Franchise fee could not possibly be grounded in
the cost or even cost, plus.  Rather, the Franchise fee is based
on ELI's gross revenues, unrelated to the City's cost of managing
its rights of way and, therefore, not fair and reasonable as a
matter of law.

The City contends that this case is really about the
Franchise fee and other compensation provisions in the Franchise
Agreement.  In fact, the case is before the court because ELI has
refused to pay the Franchise fee required by the contract.
The City explains that in return for use of its rights of way,
the City expects ELI, among other things, to pay 5% of its gross
revenues earned within Portland to the City.  The City argues
that the legislative history reveals Congress' intent to protect
a municipality's long tradition of charging utilities a gross
revenues fee as fair compensation for occupation of public rights
of way.  Essentially, the rights of way are the property held by

----

[11]    During oral argument, counsel for ELI acknowledged that
the City may be entitled to some amount over actual cost, given
that Congress elected to use the term "compensation" and there is
a legitimate distinction between the terms.

the citizens, with the local municipality acting as their representative. Moreover, the City argues that the record before the court is silent on the issue of economic impact on ELI from the imposition of a 5% fee on gross revenues. As such, there is no evidence in the record that the 5% gross revenues fee either does or may bar entry for the provider of telecommunications services.

As a threshold matter, the court is reminded that section 253(c) is not an independent substantive prohibition that operates to limit the City's right to receive compensation for use of its rights of way. Rather, it is well-established that section 253(c) is a "safe harbor" that provides "even if" relief for the cities. See, e.g., City of Auburn, 260 F.3d at 1175, 1177 (Court repeatedly refers to section 253(c) as a "safe harbor" provision.). Subsection (c) is not a limit on state and local government regulatory authority. See City of Eugene, 177 Or.App. at 406 (Court concluded that city's requirement that telecommunications providers pay a fee for use of city property did not bar entry.). Thus, section 253 preempts rights of way fees only if they would effectively prohibit provision of a telecommunications service and, even then, such fees are not preempted by section 253(c) if they qualify as fair and reasonable compensation for use of the rights-of-way.

Thus, the issue for the court is the meaning of "fair and reasonable compensation" under section 253(c). Unfortunately,

41 - OPINION AND ORDER

this term is not defined by the FTA.  Nevertheless, it is clear
that the City is expressly authorized under section 253(c) to
demand some type of "compensation" from telecommunications
providers "for use of public rights-of-way."  47 U.S.C. § 253(c);
see also TCG Detroit, 206 F.3d 618 (Court upheld a gross revenues
franchise fee.).  To determine whether the 5% of gross revenues
fee charged here is fair and reasonable compensation, the court
will consider briefly the legislative history of section 253(c).

The legislative history supports the conclusion that the
purpose of section 253(c)[12] is to enable local governments to
recoup their investments in public rights of way by imposing
"fair and reasonable" user fees on telecommunications companies,
apportioned according to the companies' actual physical use of
the rights-of-ways.  See 141 Cong.Rec. H8460 (daily ed. Aug. 4,
1995)(statement of Rep. Stupak).  In offering the amendment, Rep.
Stupak cited statistics showing that cities in the United States
spent approximately $100 billion each year on public
rights-of-way, but received only about $3 billion in return in
user fees.  Id.  Congressman Stupak stated: "It simply is not

---

[12] Section 253(c) is sometimes referred to as the Barton-
Stupak Amendment and was added by an overwhelming majority, 338-
86, on the floor of the U.S. House of Representatives.  See 141
Cong. Rec. H8460 (1995).  Representative Bart Stupak, along with
Representative Joe Barton, sponsored the amendment which
ultimately became section 253(c).

fair to ask the taxpayers to continue to subsidize

telecommunications companies." Id.

The telecommunications bill as originally proposed permitted

local governments to charge telecommunications companies for use

of the public rights-of-way; however, the bill would have

required cities to impose the same fees on all telecommunications

providers, "regardless of how much or how little they use the

right-of-way or rip up our streets." Id. Rep. Stupak opposed

this "parity" provision, arguing that, in setting user fee

levels, cities "must be able to distinguish between different

telecommunications providers" based on the extent and intensity

of their right-of-way use. As the Congressman explained, "if a

company plans to run 100 miles of trenching in our streets and

wires to all parts of the cities, it imposes a different burden

on the right-of-way than a company that just wants to string a

wire across two streets to a couple of buildings." Id.

Congressman Barton stated a similar intent:

> [The amendment] explicitly guarantees that cities and local
> governments have the right to not only control access within
> their city limits, but also to set the compensation level
> for the use of that right of way. . . .  The Chairman's
> [Manager's] amendment has tried to address this problem.  It
> goes part of the way, but not the entire way.  The Federal
> Government has absolutely no business telling State and
> local governments how to price access to their local right
> of way.

Id. (Statement of Rep. Barton).

Opponents to the amendment, such as Congressman Dan

Schaefer, made many of the same arguments that the

43 - OPINION AND ORDER

telecommunications industry has since made in petitions to the
FCC and the courts.  See, e.g., id. (statements of Schaefer)(The
Barton-Stupak amendment "is going to allow the local governments
to slow down and even derail the movement to real competition.").
Moreover, objections to the Barton-Stupak language assumed that a
fee based on a percentage of gross revenues, not simply recovery
of costs, was intended by the amendment.  See, e.g., id. at H8461
(statement of Rep. Fields)("When a percentage of revenue fee is
imposed by a city on a telecommunications provider for use of
rights-of-way, that fee becomes a cost of doing business for that
provider and, if you will, the cost of a ticket to enter the
market.").

    Representative Stupak's colleagues ultimately agreed with
him and the parity provision was defeated.  See AT & T
Communications of Southwest, Inc. v. City of Dallas, 8 F.Supp.2d
582, 594 (N.D.Tex. 1998).  The House rejected the Schaefer-Fields
arguments in favor of the MFS parity language,[13]  and adopted the
Barton-Stupak language, which was the same as the Senate language
with respect to fair and reasonable compensation for use of the
rights of way.  As one legal commentator concluded that, in so
doing:

---

[13]  Congressman Dan Schaefer was the chief proponent of the
parity language that was generally referred to as the MFS
amendment. (Telecommunications company Metropolitan Fiber Systems
(MFS) had sought inclusion of similar language in an earlier
House Bill.)

> [T]he House overwhelmingly endorsed the propositions that
> the local government is the appropriate body to make
> compensation decisions, and also that differential
> compensation based on market valuation is not
> discriminatory.  There is no trace of an assumption that the
> compensation determined by a local community would be
> limited to costs.  On the contrary . . . [legislative
> history shows that] the discussion assumed it would not.

Property Rights, Federalism, and the Public Rights-of-Way, 26
Seattle U. L. Rev. 475, 524 (2003).

The court agrees that legislative history supports the
conclusion that there is a legitimate distinction between the
terms cost and compensation and that local municipalities are
permitted to base rights of way fees on gross receipts as "fair
and reasonable compensation."  Clearly, the issue of cost versus
compensation was considered and rejected by Congress.  Congress
chose the term compensation, rather than cost, to further its
intent that local municipalities be permitted to recoup revenue
in exchange for a telecommunications provider's use of the public
streets.  Certainly, it is reasonable to base compensation on a
percentage of revenue generated, making it more likely each
entity can afford to pay the fee, and it affects all providers
equally.  Moreover, from the court's perspective, it is
inconceivable that Congress intended to strip the City of its
right to compensation for use of its rights of way.

The court turns next to decisions by the federal courts
regarding whether revenue-based rights of way fees are permitted
by section 253(c) of the FTA.  This court has already determined

that the Act did not preempt an ordinance that imposed a 7%
revenue-based usage fee upon telecommunications providers that
used the municipalities' rights-of-way.  See City of Portland,
200 F.Supp. 2d 1250.  In that case, the court stated that such
usage fee was not preempted by the FTA because the fee neither
prohibited nor had the effect of prohibiting the provisions of
telecommunications services.  Qwest, along with the other
providers, had operated for years under the cities' requirements.
Moreover, the telecommunications providers that brought suit had
previously lobbied for such a fee requirement in the ordinance.
Id. at 1254.  The court determined that such fee would have also
been saved from preemption by section 253(c) since the fee was
compensation for use of rights-of-way.  Id. at 1258-1259.  The
court explained that fees permitted under section 253(c) were not
limited to recovery of costs for management of rights of way
because subsection (c) uses the term compensation not cost.  Id.
The court ordered Qwest to resume paying a percentage of its
gross receipts to Oregon cities as compensation for its use of
their rights-of-way.  The Ninth Circuit did not rule on this
court's analysis of whether a gross revenues fee imposed pursuant
to section 253(c) must be cost-based, finding instead that the
issue was barred by claim preclusion.  See Qwest, 385 F.3d at
1243.

    In City of Dearborn, 206 F.3d 618, the court held that a
franchise fee for use of the municipality's rights-of-way was
46 - OPINION AND ORDER

fair and reasonable, considering the amount of use contemplated (27 miles), the amount that other providers would be willing to pay (three others had agreed to similar fees), and the fact that the protesting telecommunications provider had agreed in earlier negotiations to a fee almost identical to what it was now challenging as unfair. <u>Id</u>. at 625. The court distinguished the two phrases, cost and compensation, and concluded that they are not the same, and "only the totality of the circumstances could illuminate whether a fee is 'fair and reasonable.'" <u>Id</u>. at 624-625.

In addition to alleging that the city was violating the Act, TCG Detroit also alleged discrimination, because the city was not demanding the same fee from another provider, Ameritech Michigan, Inc. Regarding the claim for discrimination, the court ruled that Ameritech successfully proved that it was not subject to the fee, because of the state law under which Ameritech's predecessor, Michigan State Telephone Company, had negotiated its franchise. <u>Id</u>. at 625-626. As to TCG Detroit's allegation of discriminatory treatment, the Sixth Circuit ruled that the fact that Ameritech's prior rights exempted it from the franchise fee did not mean that the city was discriminating in Ameritech's favor. <u>Id</u>.

Nor does the court read the decision in <u>City of White Plains</u> as requiring a *per se* rule against compensation for the municipality based on gross revenues. Rather, in that case the
47 - OPINION AND ORDER

court held that the municipality's imposition of a 5% gross revenues fee was not competitively neutral and, thus, a violation of the Act. City of White Plains, 305 F.3d at 77-79. Initially, in considering the municipality's ordinance, the court determined that certain portions of the ordinance clearly had the effect of prohibiting telecommunications services. Therefore, the court found that the ordinance, considered as a whole, violated section 253(a). Id. at 77. The court then considered whether portions of the ordinance were saved by section 253(c). In considering the fee-related portions of the ordinance, the 5% gross revenues fee, the court found that the municipality had engaged in "differential treatment" of telecommunications providers because the municipality had neither required the incumbent provider (Verizon) to comply with the terms of the ordinance, including a 5% gross revenues fee provision, nor to enter into a franchise agreement as other telecommunications providers had been required to do. Id. at 79.

Thus, the different rulings concerning the fee-related provisions in the ordinances in City of Dearborn and City of White Plains turned solely on each court's view of whether there was disparate treatment for the incumbent providers, Ameritech and Verizon. The court in City of Dearborn determined that while the city had tried to treat both providers the same, it was barred by state law from doing so and, therefore, justified in the disparate compensation under the ordinance. 206 F.3d at 625.

48 - OPINION AND ORDER

The court in <u>City of White Plains</u> found that the disparate treatment of Verizon, based on its long history of services provided to the city and because Verizon provided certain in-kind compensations to the city, was not justifiable because the "[c]ity tried to exact a variety of forms of compensation from [the provider], while not exacting any compensation from Verizon on a forward-looking basis." 305 F.3d at 80.

Significantly, these two Circuit courts, the Sixth and the Second, are the only two federal circuit courts to date that have considered directly whether revenue-based fees are permitted under section 253(c). As explained above, neither of those courts has determined that a fee based on gross revenues of the provider is a *per se* violation of section 253(c). Rather, the Sixth Circuit sanctioned such a fee and held that only a "totality of the circumstances could illuminate whether a fee is 'fair and reasonable.'" <u>City of Dearborn</u>, 260 F.3d at 625. The Second Circuit objected only to the disparate treatment of the incumbent over the challenging provider when it struck the fee provision from the ordinance. <u>City of White Plains</u>, 305 F.3d at 79-80. In fact, the Second Circuit acknowledged that the statute does not require parity of treatment:

> An earlier draft of the bill that ultimately became § 253 included a provision that would have forbidden local governments from imposing any fee that "distinguishes between or among providers of telecommunications services." H.R. 1555, 104th Cong. § 243(e)(1995). Both the elimination of that provision and the language of the enacted version of § 253 strongly support the conclusion that franchise fees

> need not be equal.  Municipalities can take into account
> different costs incurred by different uses of the rights-of-
> way.  They can also consider scale of the use of rights-of-
> way.  They also retain the flexibility to adopt mutually
> beneficial agreements for in-kind compensation.

Id. at 80.  In addition, both circuit courts found that it was

reasonable for the municipalities to consider certain factors,

such as type and extent of use, in assessing fees.  See City of

Dearborn, 206 F.3d at 624-625; City of White Plains, 305 F.3d at

80.

Here, ELI has been granted ubiquitous access to all City

rights of way.  Thirteen other telecommunications providers,

along with providers of electricity, gas and cable television,

all pay franchise fees of 5% for similar privileges.  ELI

negotiated the 5% rate in 1990 and 1996 and paid that rate until

2001.  ELI does not allege, nor is there evidence in the record,

that the 5% Franchise fee has made ELI's business unprofitable or

harmed its competitive position in Portland.

It is true that incumbent Qwest operates under a somewhat

different compensation scheme from ELI.  While Qwest operates in

City rights of way without a franchise, it occupies the rights of

way pursuant to authority granted in a temporary revocable

permit.  Qwest does not have a franchise due to its history, and

the history of its Bell monopoly predecessors.  Indeed, Qwest and

the City remain engaged in litigation over Qwest's authority to

be in the City streets and the City's authority to charge it for

its presence in the streets.  See Qwest v. City of Portland, 385

F.3d 1236.  Rather, Qwest operates as a telecommunications

utility as defined in Oregon statutes.  See Or. Rev. Stat. §

759.005(1).

However, unlike Verizon in City of White Plains, Qwest pays

a privilege tax of 7% of gross revenues earned from exchange

access services.  Qwest is also subject to significant state and

federal regulations not applicable to ELI.  See generally Or.

Rev. Stat. §§ 759.005 to 759.675.  Further, ELI has not presented

any evidence to show that Qwest, using the formula applied to it,

pays a tax that is less than 5% of its gross revenues.  Finally,

there is evidence from state legislative history that Qwest, by

paying 7% of exchange access revenue, pays about the same as if

it were charged 5% of gross revenues.

Neither the terms of section 253(c), the legislative

history, or relevant case law require that the fee charged by the

City be restricted by the municipality's cost of maintaining the

rights of way.  Nor does it require absolute parity among

providers and utilities in setting compensation levels.  Rather,

those restrictions are an overlay put forth by telecommunications

providers such as ELI and it is not the law in any circuit.  The

court is satisfied, on the record before it, that the

compensation sought from ELI meets the requirements of section

253(c) that it be competitively neutral and nondiscriminatory.

The court finds that the Franchise fee charged by the City, 5% of

ELI's gross revenues, is fair and reasonable.  Thus, even if

51 - OPINION AND ORDER

subsection 3.1, titled "Amount of Compensation," were preempted by the Act under section 253(a), which this court concluded it was not, it would nevertheless be saved by the terms of section 253(c).

Having determined above that the City is permitted under the FTA to seek reasonable compensation for use of its rights of way, based on gross revenues, subsection 3.8 will also survive under the protection of section 253(c).  That provision simply requires ELI to keep accurate records of fees owed and allow the City to audit those records and confirm payment.  As the court stated above, it would be nonsensical for the court to allow the fees under the FTA, but prohibit the City from any accounting for the payment of those fees as preempted by the Act.  The court finds that even if subsection 3.8, was preempted by the Act under section 253(a), which this court concluded it was not, it would nevertheless be saved by the terms of section 253(c).

### 3. Can the Preempted Provisions be Severed from the Agreement?

Having determined that subsection 3.2 and section 9 of the Franchise Agreement are the only provisions preempted by the FTA, the court is left to determine whether those invalid requirements may be severed from the Franchise Agreement, leaving the balance of the Franchise Agreement in effect.  Not surprisingly, the parties disagree on whether an invalidated provision may be

severed from the Franchise Agreement.  They do agree, however,
that the issue is controlled by Oregon state law.

The law in Oregon is long established and clear -- disregard
the illegality and enforce the contract.  <u>See</u>, <u>e.g.</u>, <u>W. J.
Seufert Land Co. v. Greenfield</u>, 262 Or. 83, 87, 496 P.2d 197
(1972)(Part of contract that is contrary to public policy is
separable, remaining provisions of contract will be enforced.);
<u>Eldridge v. Johnston</u>, 195 Or. 379, 405, 245 P.2d 239 (1952)(Where
a contract is partly legal and partly illegal, the legal part of
the contract will be enforced where separable from the illegal
part.).  Moreover, if there is an explicit severability clause,
the court must construe that clause in a manner that best
reflects the intent of the entity that enacted it.  <u>See</u> <u>Portland
General Elec. Co. v. Bureau of Labor and Industries</u>, 317 Or. 606,
610-12, 859 P.2d 1143 (1993)(Intent is the touchstone of
statutory construction.); <u>accord</u> <u>Eduardo v. Clatsop Community
Resource</u>, 168 Or.App. 383, 387, 4 P.3d 83 (2000).

Here, the intent of the parties is clear and set forth
expressly in the Franchise Agreement.  Subsection 20.2 is a
severability clause and provides:

> Severability.  If any Section, provision or clause of this
> Franchise is held by a court of competent jurisdiction to be
> invalid or unenforceable, or is preempted by federal or
> state laws or regulations, the remainder of this Franchise
> shall not be affected, unless the City Council determines
> such Section, provision, or clause was material to the
> City's agreement to issue a Franchise to the Grantee.

The Franchise Agreement demonstrates a clear intent by the parties to sever individual items and keep the Franchise Agreement in effect whenever possible. Further, it cannot be argued seriously that subsection 3.2 and section 9 are integral or pervasive parts of the parties' agreement such that the Franchise Agreement could not stand alone in its absence. To the contrary, the Franchise Agreement remains enforceable in its entirety absent those provisions.[14] Thus, the court finds that subsection 3.2 and section 9 are severed from the Franchise Agreement, with the balance of that Agreement still in force.

**B.    Estoppel/Waiver**

The City contends that ELI is estoped from seeking preemption of the Franchise Agreement under the FTA because it has accepted its benefits. Specifically, the City explains that ELI entered into a Franchise Agreement with the City eight years ago and has enjoyed the benefits under the Franchise Agreement ever since. By its implementation of the contract, it is estopped from challenging the authority of the City to enter the contract. In support of its position, the City cites several cases holding franchisees are estopped from challenging the validity of public franchises. <u>See</u>, <u>e.g.</u>, <u>City of Jamestown v. Pennsylvania Gas, Co.</u>, 1 F.2d 871, 880-881 (2nd Cir. 1924); <u>City</u>

---

[14]    The court expresses no opinion with regard to the application of Section 17 "RENEGOTIATION" to the severed provision.

of Baker v. Montana Petroleum Co., 99 Mont. 465, 44 P.2d 735, 739 (1935).

The City also argues that ELI has waived its right to seek preemption because ELI did not raise the preemption issue in 1996 or 1999. Specifically, the City asks the court to declare that ELI has waived its rights to challenge the terms of the Franchise Agreement under either the FTA or the Equal Protection Clause. In response ELI asserts that it could not have waived its right under the FTA when it accepted the Ordinance because it did not know its right under the FTA until 2001, when the Ninth Circuit issued the decision in City of Auburn. According to ELI, the law changed after it signed the contract.

The court declines, without comment, to consider whether estoppel or waiver would apply here to bar ELI from asserting a preemption defense or counterclaim. Summary judgment based on estoppel or waiver is denied.

### C. Contract of Adhesion - Fifth Affirmative Defense

In its fifth affirmative defense, ELI asserts that it need not comply with the terms of the Franchise Agreement because it "was essentially forced to accept [the City's] non-negotiable terms." As a consequence, the contract is unconscionable (violates public policy) and may not be enforced. The City insists that ELI cannot show that its Franchise Agreement with the City is unconscionable. Regardless of the negotiating power of the two parties at the formation of the Franchise Agreement,

the provisions of the Franchise Agreement are not so one sided as to be oppressive. In particular, the Franchise fee of 5% of gross revenues is neither excessive nor unfair and ELI cannot avoid its contract obligations on the grounds that the Franchise Agreement is unconscionable.

The court declines to find that the Franchise Agreement is an unenforceable contract of adhesion excusing ELI's performance. The court has carefully considered ELI's challenges to the Franchise Agreement under the FTA. Having found that the Franchise Agreement, almost in its entirety, survives scrutiny under the rigorous requirements of the Act, it would be inconsistent for the court to now invalidate the Franchise Agreement as a contract of adhesion. Summary judgment is granted against ELI's fifth affirmative defense.

### D. IRNE - ELI's Sixth Affirmative Defense

ELI contends that the City discriminates against it by operating a telecommunications system called the Integrated Regional Network (IRNE). It provides telecommunications services to itself and certain other governmental agencies, but does not offer service to private parties. The various governmental entities supplied by IRNE are potential ELI customers. IRNE does not use facilities contributed by ELI under its Franchise Agreement.

Specifically, ELI alleges that the City has created its own competitive local exchange carrier (CLEC), IRNE, "using duct,

conduit and fiber optic cable obtained through the franchising
process for cable and telecommunications."  ELI explains that
while other CLECs must acquire and maintain their own ducts,
conduits and fiber optic cables, IRNE gets them for free from the
CLECs with which it competes.  ELI contends, without citation to
authority, that the FTA "plainly prohibits municipalities from
operating such systems in competition with other competitive
providers, using facilities provided by those competitive
provides and charging the competitive providers more for access
to the right of way."  According to ELI, creating an entity such
as IRNE and allowing it to compete with other CLECs, including
ELI, is discriminatory on its face.[15]  ELI's sixth affirmative
defense is essentially a challenge to section 9 of the Franchise
Agreement (CITY FIBER OPTIC PAIRS AND USE OF DUCTS BY CITY),
which provides in-kind compensation to the City by requiring ELI
to provide telecommunications duct and cable for the City's use.

     The City responds that IRNE operates under a franchise
agreement similar to ELI's, including being subject to the 5%
Franchise fee, a requirement to make in-kind contributions to the
City, and an obligation to protect and repair the rights of way.
The City insists that the IRNE franchise agreement does not

---

[15]     Even if the court accepts ELI's characterization of the
impact of IRNE as true, the claim is properly alleged as a
counterclaim, rather than as an affirmative defense for breach of
a contract.

violate the FTA because: (1) ELI has not been prohibited from offering any services because IRNE exists; (2) the FTA does not prohibit municipalities from operating communications networks; (3) the IRNE franchise agreement is, in all important respects, identical to the ELI Franchise Agreement and those of other competitive telecommunications carriers; (4) ELI has no standing to object because IRNE does not use any of ELI's duct, conduit or fiber optic cable; and (5) in any event, the existence of IRNE does not justify ELI's breach of contract.

It is uncontested that the City has never used any of the fiber and it has exercised its rights under the Franchise Agreement's duct provision in only one instance to run traffic signal cable for a few blocks in the Lloyd business district. Declaration of Matthew Lampe; Declaration of Mary Beth Henry. Moreover, it is uncontested that IRNE uses no facilities contributed by ELI under the Franchise Agreement. Declaration of Matthew Lampe; Declaration of Mary Beth Henry. It is also uncontested that IRNE operates pursuant to a franchise agreement just like ELI's, with a few exceptions related to the governmental nature of IRNE. Finally, this court has severed section 9 from the Franchise Agreement as preempted by the FTA because it may have the effect of barring entry. With the offending provision removed, and no duct or fiber of ELI's ever used for IRNE, it is unclear how the City's operation of IRNE could justify ELI's decision to breach the Franchise Agreement

and refuse to pay the fees owed under the contract. ELI has failed to meet its burden on this affirmative defense and summary judgment is granted.

**E.   Equal Protection Clause - ELI's Seventh Affirmative Defense**

ELI also contends that the City's treatment of it violates the Equal Protection Clause because it is treated differently than similarly situated companies, such as Qwest, with regard to its use of the rights of way. First, ELI argues that Qwest and ELI are similarly situated as users of the City's rights of way and the City offers no credible reason why they should be treated differently in that respect. It is undisputed that the City charges ELI 5% of all of its gross income for use of the rights of way; and, it charges Qwest 7% of a subset of its gross income, i.e., exchange access income. ELI alleges it would pay less under the formula for Qwest. Moreover, since Qwest only pays a franchise fee on exchange access revenues, it is not subject to any rights of way fees on certain services it provides in competition with ELI, thereby giving Qwest a cost advantage on those services. ELI charges that the City offers no rational basis for treating it and Qwest differently with respect to use of the rights of way and the associated fees.

The City responds that ELI cannot satisfy its primary burden: ELI and Qwest are treated differently and that the difference disadvantages ELI. ELI is only able to show that the

fees and taxes are calculated using a different formula.
According to the City, the evidence shows that for a similar use
of the rights of way, ELI actually pays fewer dollars to the City
than does Qwest.  In addition, the evidence establishes that ELI
is competitive with Qwest in providing all telecommunications
services in Portland and, thus, the differences in fees has not
harmed ELI.[16]

The Equal Protection Clause of the Fourteenth Amendment
commands that no State shall "deny to any person within its
jurisdiction the equal protection of the laws," in other words,
all persons similarly situated should be treated alike.  Plyler
v. Doe, 457 U.S. 202, 216 (1982).  Accordingly, in order to
establish a violation of the Equal Protection Clause, a plaintiff
must establish that he was treated differently from other
similarly situated individuals with respect to the governmental
act, statute or regulation.  Cleburne v. Cleburne Living Ctr.,
473 U.S. 432, 439 (1985).

ELI has a substantial burden to prove its affirmative
defense that the Franchise Agreement violates the Equal
Protection Clause.  See, e.g., Heller v. Doe, 509 U.S. 312,

---

[16]    The City also insists that ELI and Qwest are not
similarly situated for purposes of Equal Protection analysis; and
that ELI has failed to show that the City's Franchise Agreement
terms with ELI lacks a rational relationship to any "plausible,
arguable, or conceivable" purpose of the government.  Jackson
Water Works v. Public Utilities Comm. of California, 793 F.2d
1090, 1094 (9th Cir. 1986).

320-21 (1993) (The burden is on the challenger to disprove "every conceivable basis which might support [a legislative classification] . . . whether or not the basis has a foundation in the record."). Because the classifications at issue here are not drawn along suspect or quasi-suspect lines, such as race, or when the law impinges upon a fundamental right, the court need only conduct a rational basis review. See Fed. Communications Comm'n v. Beach Communications, 508 U.S. 307, 313 (1993); see also Clements v. Fashinq, 457 U.S. 957, 963 (1982). On a rational basis review, a classification bears a strong presumption of validity, and the burden of persuasion is on a challenger to show the absence of a rational basis. Beach Communications, 508 U.S. at 313. A rational basis is "any reasonably conceivable state of facts" that support the classification. Id. Such facts may be based on "rational speculation unsupported by evidence or empirical data." Id.

Here, ELI insists that it is treated differently from Qwest. While the court remains unconvinced that Qwest and ELI are similarly situated entities by focusing solely on their respective use of the rights of way, the court will do so, but only for purposes of resolving the instant motion. ELI must also show, however, that the City treats it differently from Qwest and that there is no rational basis for so doing.

Regarding different treatment, as mentioned above, ELI has not presented evidence to show that Qwest, using the formula

applied to it, pays a tax that is less than 5% of its gross
revenues.  ELI has established only that the fees and taxes for
itself and Qwest are calculated using a different formula.  Based
on this, ELI argues only that it, ELI, would pay less under the
formula used for Qwest.  ELI has not shown that Qwest pays less
for the ubiquitous use of the rights of way that ELI enjoys.  In
fact, there is some evidence in the record that ELI actually pays
less than Qwest for the same use.  In addition, there is evidence
from state legislative history that Qwest, by paying 7% of
exchange access revenue, pays about the same as if it were
charged 5% of gross revenues.  Finally, ELI has not established
that it pays more in Franchise fees than Qwest pays in privilege
taxes.  ELI has not shown that it is treated differently from
Qwest.

Even if ELI were able to show disparate treatment, it fails
in its burden to disprove the basis upon which the City's
classifications rests.  It is true that incumbent Qwest operates
under a somewhat different compensation scheme from ELI.  While
Qwest operates in City rights of way without a franchise, it
occupies the rights of way pursuant to authority granted in a
temporary revocable permit.  Qwest does not have a franchise due
to its history, and the history of its Bell monopoly
predecessors.  Rather, Qwest operates as a telecommunications
utility as defined in Oregon statutes.  See Or. Rev. Stat. §
759.005(1).  Qwest pays a privilege tax of 7% of gross revenues

earned from exchange access services.  Qwest is also subject to significant state and federal regulations not applicable to ELI. See generally Or. Rev. Stat. §§ 759.005 to 759.675.

The City explains that is has regularly charged all utilities franchise or license fees of 5% of gross revenues based on a long-standing local and state policy that public utilities using local streets should generally pay fees based on about 5% of their gross revenues earned within the affected locality. Moreover, it was rational to request 5% of gross revenues from ELI even though Qwest paid on the basis of 7% of exchange access revenues.  The legislature had established Qwest's new calculation methodology with the understanding that it would be equivalent to charging Qwest 5% of its gross revenues.  On the other hand, charging ELI for exchange access revenues alone would have markedly undervalued its use of the rights of way.

The court finds that ELI has failed in its burden to establish and a violation of the Equal Protection Clause.  Even assuming that ELI and Qwest are similarly situated for purposes of use of the rights of way, ELI has shown neither that it is treated differently from Qwest or that there is no conceivable rational basis for that different treatment.  Summary judgment is granted against ELI's seventh affirmative defense - Equal Protection Clause.

**F.    Contract Interpretation**

The City also requests that the court grant summary judgment on three contract interpretation disputes between the City and ELI.  Specifically, the City and ELI disagree about what lines of revenues should be included in "gross revenues" on which Franchise fees are levied.  When this case was initially filed, there were five contract interpretation disputes between the parties.  According to the City, five revenue streams that ELI excluded from its Franchise fee calculations should be included as "gross revenues" under the Franchise Agreement.  These were revenues from: (1) internet access; (2) wholesale services; (3) CABS/LABS; (4) collocation; and (5) finance charges.  ELI has informed the City that it will pay a Franchise fee on revenues earned from internet access and wholesale, leaving the issues of CABS/LABS, collocation and finance charges unresolved.

The question for the court is what amounts are included in the term "gross revenues derived by ELI for the provision of telecommunications services" under the Franchise Agreement.  The terms gross revenues and telecommunications services are defined by the Franchise Agreement as follows:

> Gross Revenues shall mean gross revenues derived by Grantee
> for the provision of Telecommunications Services (I)
> originating or terminating in Portland, Oregon and (II)
> charged to a circuit location in Portland, Oregon regardless
> of where the circuit is billed or paid.

Telecommunications Services means:

(A) Services interconnecting interexchange carriers, competitive carriers, and/or wholesale telecommunications providers for the purpose of voice, video, or data transmission;

(B) Services connecting interexchange carriers and/or competitive carriers to telephone companies providing local exchange services for the purpose of voice, video, or data transmission;\

(C) Services connecting interexchange carriers or competitive carriers to any entity, other than another interexchange carrier, competitive carrier, or telephone company providing local exchange services, for the purpose of voice, video, or data transmission;

(D) Services interconnecting any entities, other than interexchange carriers, competitive carriers, or telephone companies providing local exchange

services, for the purpose of voice, video, or data transmission; and

. . . .

(F) Other telecommunications services as authorized by the Federal Communications Commission or the Oregon Public Utility Commission.

**1.  Collocation Services**

ELI contends that one aspect of its collocation services[17]

in not a telecommunications service as defined by the Franchise

_____

[17]    Jim Kinner, ELI's Marketing Director described collocation as follows:

In our collocation centers and data centers, we provide a physical location and racks for a customer to install their equipment in our location, and then we provide the connectivity, telecommunications services to connect from that location out to wherever the customer needs to go.

Agreement. Second Declaration of James Kinner. ELI contends that there are two distinct aspect to its collocation product, renting physical space for a customer to place his own equipment and connecting the customer's own equipment to ELI's network via a wired telecommunications connection supplied by ELI. ELI concedes that the latter service, the wired connection, is a telecommunications service, but seeks to exempt the rental revenue.

The court disagrees. By ELI's own admission, the purpose of the rental space is to connect the customer to ELI's network. Indeed, ELI does not rent space to a customer unless they also purchase connectivity. Deposition of Jim Kinner. Moreover, collocation is considered a telecommunications service in the standard usage of the telecommunications industry. <u>See</u>, <u>e.g.</u>, Or. Rev. Stat. § 756.010(8)(Service includes equipment and facilities related to providing the service or product served.); <u>Oregon PUC</u>, Order No. 96-079, <u>In Re US West Rates</u> ("[C]ollocation is an access service and not a real estate transaction."). Both revenues from collocation services must be counted in determining gross revenues on which the Franchise fees are levied.

### 2. CABS/LABS Revenues

CABS and LABS revenues are payments made by other telecommunications carriers to ELI for accessing its network. The parties stipulated to the following:

1.    ELI earns revenues from other telecommunications
      providers using what are know as the Carrier Access
      Billing System (CABS) and the Local Access Billing
      System (LABS).

2.    Under the CABS system, ELI is paid by long distance
      telecommunications carriers for "originating or
      "terminating" a long distance call on its network.

3.    For instance, if a Portland ELI customer calls Seattle
      using MCI long distance, the ELI customer pays MCI the
      cost of the call.  MCI, in turn, pays ELI a per minute
      fee because the call was "originated" on ELI's network
      in Portland and utilized ELI-owned facilities,
      including what is called a "local switch."

4.    Similarly, if an MCI long distance customer in Seattle
      calls an ELI customer in Portland, the Seattle customer
      pays MCI for the long distance call, and MCI, in turn,
      pays ELI because the call "terminated" on ELI's network
      in Portland and utilized ELI-owned facilities,
      including a local switch.

5.    A portion of ELI's total CABS revenue is earned for
      calls originating and terminating on ELI's network in
      Portland.

6.    ELI's CABS is able to send invoices to long distance
      carriers because it can identify and time each non-ELI
      long distance call that originates or terminates on
      ELI's network and travels through a local ELI switch.
      Thus, in the examples given above, ELI can bill MCI in
      each case for the origination or termination of the MCI
      long distance call on ELI's local Portland network
      because it knows when, for how long, and from what or
      to what number the calls were made.

7.    Under the LABS system, ELI is paid by other local
      telecommunications companies for local calls that
      terminate (but not originate) on ELI's network.  Thus,
      if a Qwest customer in Portland calls and ELI customer
      in Portland, Qwest pays ELI a charge tor terminating
      the call on ELI's network.

8.    ELI's LABS system is able to send bills to other
      companies because it can identify and time each local
      call that terminates on ELI's network and travels
      through a local ELI switch.  Thus, in the example
      given, ELI can bill Qwest because it knows when and for

how long and to what number on ELI's network a Qwest
customer made a call.

9.    A portion of ELI's total LABS revenue is earned for
      calls terminating on ELI's network in Portland.

According to ELI, CABS and LABS revenues are not "charged to
a circuit location in Portland" as that term is understood in the
Franchise Agreement.  Rather, such revenues are charged to long
distance and local carriers who carried the traffic.  Second
Declaration of Kinner.

The City responds that Kinner's interpretation of the term
"circuit location in Portland" is in error.  The City insists
that, based upon the stipulated facts, the requirements for gross
revenues and telecommunications services, as those termed are
defined in the Franchise Agreement and in accordance with their
common usage, are satisfied by the CABS and LABS revenues and as
such they must be counted in determining the Franchise fee.  The
revenues are "derived . . . for the provision of
telecommunications services" that are either "originating or
terminating in Portland, Oregon" and the CABS and LABS revenues
are "charged to a circuit location in Portland, Oregon regardless
of whether the circuit is billed or paid."  The City explains
that ELI passes telecommunications traffic over its network by
connecting its customers to other telecommunications firms'
customers and gets paid for that service.  It is the fact that
the calls originate or terminate in Portland that subject them to
CABS and LABS charges; and ELI uses a local Portland switch or
68 - OPINION AND ORDER

circuit to make or break the connection; and, ELI is able to distinguish charges earned by the local circuit from those in other localities. The City assesses Franchise fees on CABS/LABS revenue only if the revenue was earned for providing services in Portland, using Portland-based switches and circuits.

ELI does not dispute the above. Accordingly, the court concludes that revenues from CABS/LABS charges must be included in gross revenues on which the Franchise fees are levied.

### 3. Finance Charges

The City maintains that the finance charges, or late fees, ELI collects from its customers are included in gross revenues. The City insists that the late fees are part of the cost of the telecommunications service the customer purchases. The charge being one amount if paid by 30 days and a greater amount if paid after 30 days.

ELI asserts that finance charges are not gross revenues derived from telecommunications services. Rather, when a customer is delinquent in making payment, ELI is forced to extend credit to that customer and ELI charges a fee for that service. The court agrees. Finance charges or late fees are not included in gross revenues on which Franchise fees are levied.

## II.  Motions to Strike

### A.  ELI's Motion to Strike

In addition to its opposition to the City's Motion for
Partial Summary Judgment, ELI has also filed "Motion to Strike,
in Whole or in Part, Declarations of Ed Whitelaw and Bridger M.
Mitchell, and [Defendant's][18] Alternative Motion to File Expert
Testimony" pursuant to Rule 12(f) of the Federal Rules of Civil
Procedure.  By this motion ELI seeks to strike the declarations
of Whitelaw and Mitchell because the City failed to disclose them
as experts –– their identities and opinions –– in discovery.  In
the alternative, ELI asks the court to allow it to file the
declaration of Thomas Zepp, containing expert testimony that
contradicts many of the statements by the City's experts.  The
City does not object to ELI's filing of the Zepp declaration,
provided the court does not strike the Whitelaw and Mitchell
declarations.

Finally, ELI maintains that the Whitelaw declaration should
be stricken, in any event, because it contains inadmissible
evidence and does not comply with the substantive legal
requirements for expert testimony.  Specifically, ELI asserts
that Whitelaw's testimony is unreliable, does not assist the
court in understanding the evidence or determining a fact in
issue, he does not qualify as an expert in the valuation of urban

---

[18]    The court assumes ELI intended to title this
"Defendant's" rather than "Plaintiff's".

rights of way and his testimony is largely made up of inadmissible hearsay.

ELI's Motion to Strike, in Whole or in Part, Declarations of Ed Whitelaw and Bridger M. Mitchell, and [Defendant's] Alternative Motion to File Expert Testimony is denied.

**B.    The City's Motion to Strike**

In addition to its opposition to ELI's Motion for Summary Judgment, the City has also filed a "Motion to Strike Portions of Second Declaration of Jim Kinnier" as inadmissible parol evidence.  According to the City, Kinnier, who joined ELI in 1999, three years after the negotiation of the Franchise Agreement, purports to testify as to what the terms of the City/ELI Franchise Agreement mean and such testimony is not allowed for purposes of judicial interpretation of contracts.

ELI responds that the Kinnier declaration simply explains the nuances of pricing in the telecommunications industry, as well as certain facets of ELI's business.  ELI argues that the Kinnier declaration merely provides factual background and context for some of the agreement's terms -- not add new terms to the agreement -- and such testimony is not excluded by the parol evidence rule.

The City's Motion to Strike Portions of Second Declaration of Jim Kinnier is denied.

**CONCLUSION**

Based on the foregoing, the City's Motion for Partial Summary Judgment (doc. #58) is GRANTED, in part, and DENIED, in part; the City's Motion to Strike (doc. #83) is DENIED; Electric LightWave, Inc.'s Motion for Summary Judgment (doc. #51) is GRANTED, in part, and DENIED, in part; and Electric LightWave, Inc.'s Motion to Strike (doc. #77) is DENIED.

IT IS SO ORDERED

DATED this __5__ day of May 2005

_/s/ Donald C. Ashmanskas_
DONALD C. ASHMANSKAS
United States Magistrate Judge